IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| SEAN M. RINEY,<br><br>               Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>           Defendant. | CASE NO. 5:23-cv-1776<br><br>DISTRICT JUDGE<br>PAMELA A. BARKER<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Sean Riney filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In February 2021, Riney filed an application for supplemental security income alleging a disability onset date of November 1, 2019,[1] and claiming he was disabled due to bipolar disorder; post-traumatic stress disorder; severe

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

depression; neuropathy in feet and legs; lumbar degenerative disc disease; spinal stenosis; lumbrosacral spondylosis without myelopathy; chronic pain in back, hips, and legs; lumbago with sciatica on the right side; bulging or herniated disc; plantar fasciitis; peripheral polyneuropathy; radiculopathy of lumbo-sacral region; myalgia; anxiety; hypertension; asthma; and chronic prostatitis. Tr. 217, 244. The Social Security Administration denied Riney's application and his motion for reconsideration. Tr. 102, 113. Riney then requested a hearing before an Administrative Law Judge (ALJ). Tr. 139.

In May 2022, an ALJ held a hearing. Riney and a vocational expert testified. Tr. 37–72. In June 2022, the ALJ issued a written decision finding that Riney was not disabled. Tr. 14–30. The ALJ's decision became final on July 28, 2023, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Riney filed this action on September 13, 2023. Doc. 1. He asserts the following assignment of error:

> The ALJ's Residual Functional Capacity ("RFC") finding is not supported by substantial evidence because the analysis of Licensed Professional Clinical Counselor Barbara DeLeone's Off-Task/Absenteeism Questionnaire did not abide by the Commissioner's revised regulations for evaluating opinion evidence.

Doc. 7, at 1.

**Evidence**

*Personal and vocational evidence*

Riney was born in 1970 and was 49 years old on the date he filed his application. Tr. 29. He attended school up to eleventh grade. Tr. 50. He last worked as a "floor tech," buffering floors and moving furniture, and stopped working shortly before the Covid-19 pandemic began. Tr. 50.

*Relevant medical evidence*[2]

In March 2019, Riney saw his primary care physician, Dr. Laszlo, and requested a refill of his sleep medication, Restoril. Tr. 354. Riney said that he was doing well on his medication and denied any side effects. Tr. 354. Dr. Laszlo described Riney as alert and "well appearing." Tr. 355.

In December 2019 and January 2020, Dr. Laszlo refilled Riney's Restoril prescription. Tr. 335, 339. At a visit with another provider in January 2020, Riney denied any psychiatric or behavioral issues. Tr. 333. In July 2020, Riney denied experiencing depression or "inordinate anxiety." Tr. 316. Later that month, Riney's wife called Dr. Laszlo's office and reported that Riney was experiencing a flare-up of his irritable bowel syndrome, prostatitis, and anxiety, and requested medication for Riney's urology and gastrointestinal symptoms. Tr. 310.

---

[2]     Riney only challenges the ALJ's evaluation of his mental impairments, so I only cite the medical evidence corresponding to those impairments.

In October 2020 and February 2021, Dr. Laszlo refilled Riney's Restoril prescription. Tr. 300–02.

In January 2021, Riney saw Licensed Clinical Professional Counselor Barbara DeLeone for counseling "in response to" a domestic violence charge involving Riney's adult son. Tr. 442. On exam, Riney was pleasant and cooperative and had an appropriate affect and a moderately anxious mood. Tr. 445. He was fully oriented and his speech, thought process and content, perception, insight, and judgment were all normal. Tr. 445. DeLeone characterized Riney as a "nervous guy" who regretted not attending counseling sooner. Tr. 445.

Riney attended weekly therapy sessions with DeLeone. At some or all of the appointments in February, DeLeone found that Riney exhibited the following: a moderately anxious and dysphoric mood, concrete thought process, and impaired judgment. Tr. 447, 449, 451, 453.

On March 4, 2021, DeLeone wrote a letter on Riney's behalf in response to the Social Security Administration's request for information. DeLeone listed Riney's diagnoses as chronic post-traumatic stress disorder (PTSD), generalized anxiety disorder, and persistent depressive disorder. Tr. 389. She wrote:

> I began seeing [Riney] at the end of January 2021 and he has continued weekly visits. He is working on improving his anger response. He is also working on repairing family relationships. He reports that his adult life is a dramatic improvement from his childhood that included night terrors. Nightmares

4

are current. He scored Extremely Depressed using BDI-II [Beck Depression Inventory], while he scored Moderate for Anxiety (BAI) [Beck Anxiety Inventory]. Responding to the parameters listed in your letter for psychological difficulties, Mr. Riney reported no memory problems and he seems able to maintain concentration, noting his interest in reading. Additionally, he has demonstrated persistence in attending weekly counseling sessions as well as completing homework assignments. He demonstrates quick understanding during counseling sessions and he has demonstrated the ability to complete multiple step tasks involving counseling homework. He only began counseling a month ago, so improvement is expected in his interactions with others. This has been a focus of counseling. I have not assessed work pressures, per se. I noticed that Bi-Polar Disorder I was identified in the letter.

I have not diagnosed him with BPD-I, however, it is not ruled [] out and will be assessed in the near future. I hope at some point in the far future, Mr. Riney will work toward securing appropriate part-time employment. At this time, I have recommended that he identify volunteer work involving a couple hours/once/week as a place to begin to prepare for eventual part-time employment. No GED is a major barrier for suitable employment particularly due to his mostly physical work history: Roofer, Floor Tech, restaurants, and factory/corrugated cardboard.

Tr. 389–90.

In March 2021, DeLeone found that Riney exhibited the following: a mildly anxious but optimistic mood, a moderately anxious and dysphoric mood,[3] concrete thinking, and impaired judgment. Tr. 455, 457.

---

[3]     A dysphoric mood is disquiet, restlessness, or malaise. *See* Dorland's Illustrated Medical Dictionary 573 (33rd ed. 2020).

5

In early April 2021, DeLeone described Riney's behavior as "alert, belligerent, manipulative, provocative, [and] withdrawn." Tr. 459. He had an inappropriate affect; a blocked, irrational thought process; impaired insight and judgment; and an angry, severely anxious mood. Tr. 459. A week later, DeLeone described Riney's behavior as "ritualistic" and his mood as "anxious: severe, angry, depressed, fearful, miserable." Tr. 461. DeLeone indicated that Riney's thought processes was both "coherent" and "irrational." Tr. 461. Riney's judgment was impaired. Tr. 461. Riney's appearance, orientation, speech, thought content, and insight were within normal limits. Tr. 461. By the end of April, Riney's mental status exam was unremarkable except that Riney was "rocking" in addition to being cooperative and pleasant, and his mood was "anxious; panic, depressed." Tr. 467.

Also in April 2021, Riney's wife, on DeLeone's recommendation, called Dr. Laszlo's office to ask for anxiety medication for Riney. Tr. 401. Riney's wife said that Riney was too anxious to leave home for an office visit. Tr. 401. Dr. Laszlo prescribed Effexor. Tr. 401. At a May 2021 office visit, Dr. Laszlo described Riney as alert and in no acute distress and refilled Riney's sleep medication. Tr. 400.

In May 2021, Riney was "rocking" and had a severely anxious and depressed mood. Tr. 470. His other exam findings were within normal limits. Tr. 470. All of Riney's exam findings were normal at his next two May appointments. Tr. 472, 474. In late May, DeLeone wrote an addendum to her

April letter to the Agency and stated that she "recently" diagnosed Riney with severe bipolar I disorder and severe anxious distress. Tr. 392.

Also in May 2021, Riney saw Gary J. Sipps, Ph.D., for a psychological consultative exam. Tr. 419. Dr. Sipps described Riney's appearance as appropriate and his grooming and hygiene as good. Tr. 421. Riney was pleasant and cooperative and made appropriate eye contact throughout the interview. Tr. 421. He exhibited a dysthymic mood, subdued affect, and anxious body movements. Tr. 421. His speech, thought content and process, and memory were normal. Tr. 421–22. Dr. Sipps estimated that Riney's intellectual ability appeared to be in the borderline range. Tr. 422. He opined that Riney could remember basic instructions and did not appear to have any limitations with social interaction. Tr. 423.

At appointments with DeLeone in June 2021, Riney's exam findings were normal. Tr. 477, 479. At an appointment with DeLeone in early July 2021, Riney exhibited rocking behavior. Tr. 481. Riney's other exam findings were normal. Tr. 481. At the next two sessions, all of Riney's mental exam findings were normal. Tr. 484, 486. Riney reported that he was re-thinking his need for medication due to "rapid cycling." Tr. 484. At Riney's last visit in July, Riney had an angry, anxious, and depressed mood and his other findings were normal. Tr. 488.

At appointments with DeLeone in August 2021, Riney's mental status findings were normal. Tr. 491, 493.

7

In early September 2021, Riney reported feeling well, but also described experiencing a recent mental breakdown. Tr. 677.

In mid-September 2021, Riney saw Dr. Laszlo complaining of anxiety and manic episodes. Tr. 497. Upon exam, Riney was alert and in no acute distress. Tr. 498. He had normal behavior, mood, affect, speech, thought content, judgment, memory, and cognition. Tr. 498. Dr. Laszlo prescribed Clonazepam (Klonopin) for anxiety and Lamictal (Lamotrigine) for bipolar disorder. Tr. 498.

A week later, Riney saw DeLeone and reported that Klonopin alleviated his anxiety. Tr. 678. He hadn't tried his Lamictal and DeLeone wrote that Riney "finally agreed to try" it. Tr. 678. On exam, Riney was alert and oriented and had an appropriate affect and a depressed mood. Tr. 678. Riney said that he was having breakdowns and panic attacks. Tr. 678. DeLeone described Riney's "interpersonal" skills as "interactive" and Riney's "functional status" as "impaired." Tr. 678. The following week, Riney complained of side effects after he tried Lamictal. Tr. 679. His exam findings were the same as the week before. Tr. 679.

On October 4, 2021, DeLeone wrote another letter to the Agency. Tr. 506–07. This time she listed Riney's diagnoses as chronic PTSD, generalized anxiety disorder, and major depressive disorder with melancholic features. Tr. 506. DeLeone provided an update of Riney's condition:

> We have continued nearly weekly sessions and he has worked to better control his anger response,

8

resulting in improved family relationships. Depression and Anxiety have been worsening in the past couple months. He recently scored Sever[e] for both Anxiety and Depression, using Beck.

As a Certified Rehabilitation Counselor and mental health counselor, I am normally encouraging people to return to work as soon as they safely can. Work can keep people healthy by providing meaning & purpose in their lives. In Mr. Riney's case, he is not currently capable of volunteer work nor of working toward completion of his GED, even. He has never stopped complaining of awful back pain and awful depression & anxiety. He describes symptoms as constant state of terror, nightmares, panic attacks and stomach in "knots". He is always in motion, either rocking, shaking, or tapping his foot. He reports agitation; his fists are clenched. Many of these symptoms are visible during his sessions. He had improved for a while to the point where he could pick up his guitar that he had not touched in years. He has struggled such in the past several months, that [he] has not been able to touch his guitar. Mr. Riney has been terrified to leave his home and fears seeing a dentist. He has processed childhood trauma.

I have encouraged Mr. Riney to try psychotropic medication but he has consistently stated that the side effects for medicines have created more problems. He recently agreed to try a newly prescribed medication, Lamotrigine, but after one pill, he reported experiencing overwhelming depression that continued for days. Pristiq was prescribed but Mr. Riney reports terror about taking it. Very recently, Mr. Riney agreed to see a psychiatrist for the first time for education/medicine recommendations.

My opinion is that Mr. Riney is not able to work competitively at this time due to his psychological struggles that have been relentless. I do not expect Mr. Riney will be able to work, if ever, for a long time.

9

Tr. 506–07. The same day, DeLeone wrote a letter to Riney's new psychiatrist,

Dr. Pakeeree, stating:

> I have seen Mr. Riney weekly or so since the beginning of this year. He has worked on improving his anger response and repairing family relationships, making strides; however, he is beset with symptoms! Mr. Riney reports current nightmares are an improvement from night terrors during childhood. Early on, he reported inability to leave his home. This has improved. He had reported frequent panic attacks, which have improved. He has been fearful to see a dentist, despite need. He reports feeling in a constant state of terror. This had improved, but is now worse. He reports depression as overwhelming. We have completed some trauma therapy, leading to his better understanding of himself. Very recently, he reported his stomach "in knots". His body is always in motion: rocking, shaking, tapping his foot, fists clenched and agitated. Five months ago, he picked up his guitar for the first time in years and had a ball. In the past couple months, he has not had the will to play. At the beginning of the year, he scored Extremely Depressed using BDI-II, while he scored Moderate for Anxiety (BAI). Mr. Riney reports no plans to harm himself or others. Most recently, he repeated the testing, scoring extreme for depression and extreme for Anxiety.
>
> Mr. Riney's wife is ill with MS about which she has been deemed unable to work. Their two children are in their early twenties, working @ fast food while living with their parents. Mr. Riney had a domestic violence charge at the beginning of this year involving his son. He has not since reported loss of control.
>
> Mr. Riney sees Dr. Laszlo who has prescribed Klonopin which Mr. Riney reports taking as needed and helping his anxiety. He began using medical marijuana several months ago, reporting some relief

> for his back pain and also aiding with anxiety but not enough. Mr. Riney reports past use of Trazadone, Tramadol, Topamax and Effexor. Most recently, he took one dose of recently prescribed Lamotrigine. His reaction to the drug was frightening for himself and his family. The worst of all his symptoms appeared and it took days to reconcile. Pristiq was just prescribed but Mr. Riney is afraid to take it. It took 9 months for Mr. Riney to consider daily medication. He is terrified of side effects from meds.
>
> Mr. Riney is really struggling physically and psychologically. He has report[ed] applying for Social Security Disability, deeming himself unable to work due to his psychological struggles (I agree). I do not know his back diagnosis. An appeal was recently filed for his SSD case. Mr. Riney has no GED, greatly limiting job prospects even if he were healthy. I appreciate your medication ideas that may improve his lot in life.

Tr. 511–12.

At appointments with DeLeone in early October 2021, Riney had an appropriate affect and a depressed or dysphoric mood. Tr. 680, 681. DeLeone described Riney's functional status as impaired. Tr. 680, 681. In late October, DeLeone described Riney's functional status as "intact" and said that Riney showed good insight. Tr. 682.

In early November 2021, Riney saw psychiatrist R. A. Pakeeree, M.D., for an initial consultation. Tr. 618. Riney reported having a long history of mood disorder. Tr. 618. He described manic and depressive periods. Tr. 618. Dr. Pakeeree's exam findings showed that Riney had a depressed mood and affect and "some mild[ly]" pressured speech. Tr. 619. Riney had good

concentration, attention, insight, and judgment. Tr. 619. Dr. Pakeeree opined that Riney "appears to have Bipolar-type I disorder, with depression and anxiety, as well as mixed episodes," and prescribed Vraylar. Tr. 620.

At a follow-up visit two weeks later, Riney told Dr. Pakeeree that he only took Vraylar for two days because it made him feel more irritable and angry. Tr. 621. Riney used medical marijuana, which helped him relax and improved his sleep. Tr. 622. Dr. Pakeeree observed that Riney's mood and affect were appropriate, and his conversation was coherent and relevant. Tr. 621. Dr. Pakeeree prescribed Depakote. Tr. 622. A week later, Riney told Dr. Pakeeree that he didn't want to take Depakote because he was concerned about weight gain. Tr. 623. He wanted to try Vraylar again. Tr. 623. Dr. Pakeeree's exam findings showed that Riney's mood and affect were "somewhat anxious" and Riney's conversation was coherent and relevant. Tr. 623.

In November 2021 visits with DeLeone, Riney had a depressed mood, appropriate affect, and intact functional status, Tr. 683; a flat affect, depressed mood, and impaired functional status, Tr. 684; and an appropriate affect, euthymic mood,[4] and impaired functional status, Tr. 685. At all visits, Riney was alert and oriented and interactive or intermittently interactive. Tr. 683–85. These exam findings were similar in December 2021. Tr. 687–89. Also in December, Dr. Laszlo refilled Riney's sleep medication prescription. Tr. 562.

---

[4]    A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's, *supra*, at 647.

In an early January 2022 visit with DeLeone, Riney had an appropriate affect, euthymic mood, intact cognitive function, and was interactive. Tr. 691. At the next visit that month, Riney appeared depressed, but his other findings were unremarkable. Tr. 693. At both visits DeLeone characterized Riney's functional status as impaired. Tr. 691, 693.

In February 2022, Riney presented once with a depressed mood with other normal findings, Tr. 694, and three times with a euthymic mood with other normal findings, Tr. 695–97. Ms. DeLeone characterized Riney's functional status as impaired at all of these sessions. Tr. 694–97.

In March 2022, Dr. Laszlo refilled Riney's sleep medication. Tr. 658, 661.

In March 2022 sessions with DeLeone, Riney presented first with a dysphoric mood and other normal findings, Tr. 699, and then twice with a euthymic mood and other normal findings. Tr. 702–03. DeLeone described Riney's functional status as intact at the later two visits. Tr. 702–03. At the last March visit, Riney said that he rarely left home and hadn't driven in months. Tr. 703.

In early April 2022, Riney saw Dr. Laszlo. Tr. 640. He reported short-term memory loss for years. Tr. 640. On exam, Riney was alert and in no acute distress. Tr. 643. His exam findings were normal: mood, affect, speech, behavior, thought content, judgment, insight, cognition, and memory. Tr. 643. Dr. Laszlo refilled Riney's sleep medication prescription. Tr. 643.

13

In mid-April 2022, Riney saw DeLeone for counseling. Tr. 706. Riney's mental status exam was normal and DeLeone characterized Riney's functional status as intact. Tr. 706. A week later, Riney's affect was constricted, his mood was depressed, and he was only intermittently interactive. Tr. 708. DeLeone described Riney's functional status as impaired. Tr. 708. At the end of April, Riney's mood was depressed, his other findings were normal, and DeLeone assessed Riney's functional status as impaired. Tr. 710.

In late April 2022, DeLeone wrote another letter to the Commissioner. DeLeone listed Riney's diagnoses as chronic PTSD, severe bipolar I disorder, agoraphobia with panic, and paranoid personality disorder. Tr. 626. DeLeone stated:

> Update: Mr. Riney & I have continued nearly weekly sessions and he has improved somewhat in areas of family harmony. Mr. Riney rarely leaves his home. He states he is barely able to engage with others. He describes feeling overwhelmed and often experiences a panic attack when he leaves his home. He reports terror about crowds and engaging with others beyond "Hello". He spends most of his time in his room @ home where he has the most comfortable furniture for his back pain. He scheduled aquatic therapy but was not able to follow-through by attending appointments due to agoraphobia symptoms.
>
> Mr. Riney reports taking Zanaflex, Restoril, Benadryl and medical marijuana to get to sleep each night, and at that only gets 4 hrs/sleep each night. He reports night terrors during which he is startled awake with a racing heart. He reports awakening by his body jerking, startling him and leading to a panic attack. He reports atrophy in 1 leg, restless leg movement during the night, memory issues and

foggy brain. He reports experiencing itching, bugs crawling and night tremors @ night. He recently reports sexual dysfunction issues. He reports what he calls dyslexia-like symptoms, a disconnect of letters and #s that interfere with his ability to improve his guitar-playing. Psychotropic medication has not worked for him to address diagnosis' listed above. Generally, he is sensitive to medications and he has repeatedly experienced worsening symptoms each time he has tried a new medicine. He has reported some help from medical marijuana for anxiety, pain & depression.

Mr. Riney has not driven in >1 year because he is so easily distracted but primarily because he cannot feel the gas or br[]ak[e] pedals due to neuropathy in his feet.

Work options are limited due to no GED but for multiple reasons, work is not currently realistic. During sessions, Mr. Riney still rocks, despite our reprocessing his childhood trauma. Mr. Riney has been encouraged to see a dentist since we began working together >1 year ago, a goal he has not yet achieved. How is work possible when Mr. Riney can barely leave his home and has not even been able to get to an aquatic therapy appt? I recommended to Mr. Riney that he see Dr. Bina Mehta, a PM&R physician, in response to his recent complaints about his current Family Practice physician. He has not been stable enough to seriously consider completion of his GED. Mr. Riney is not currently able to perform even volunteer work.

Tr. 626–27.

In early May 2022, Riney saw DeLeone and was "out-of-sorts." Tr. 712. At this visit and the next, he had a labile[5] affect and depressed mood, and was alert, oriented, and interactive during the exam. Tr. 712, 714. DeLeone

---

[5]     A labile affect is fluctuating or unstable. *See* Dorland's, *supra*, at 981.

assessed his functional status as impaired. Tr. 712, 714. At the end of May, Riney had a depressed mood, an appropriate affect, and was oriented, alert, and interactive. Tr. 716. DeLeone described Riney's functional status as impaired. Tr. 716.

On May 22, 2022, DeLeone completed a "Medical Statement" and an "Off-Task/Absenteeism Questionnaire" on Riney's behalf. Tr. 668–69. DeLeone said that she began seeing Riney in January 2021. Tr. 668. She assessed Riney with moderate limitations in understanding, remembering, or applying information and adapting or managing himself, and marked limitations in interacting with others and concentrating, persisting, or maintaining pace. Tr. 668. DeLeone opined that Riney would likely be off-task 20 percent of the time during a workday. Tr. 669. She listed the following symptoms in support: back pain and depressive and manic episodes; inability to concentrate, indicated by Riney's report that his "guitar learning [was] stifled more days than not"; drowsiness due to lack of sleep; fatigue caused by medication side-effects; and PTSD symptoms. Tr. 669. DeLeone also stated that Riney would be absent from work more than four days a month due to his impairments or treatment. Tr. 669. DeLeone indicated that the severity of all of Riney's assessed limitations "existed since at least November 1, 2019," and that Riney "could no longer work due to back pain [and] emotional pain." Tr. 669. She said that at Riney's last job, he "worked for a few hours and spent remaining [full-time] shift crying/hiding." Tr. 669.

16

*State agency opinions*[6]

In July and October 2021, state agency psychologists Courtney Zeune, Psy.D., and Cynthia Waggoner, Psy.D., respectively, reviewed Riney's record. Tr. 104–07, 110, 114–18, 121. As to Riney's residual functional capacity (RFC),[7] the doctors opined that Riney could perform simple, one– to two–step tasks and occasionally complex, three– to four–step tasks. Tr. 110, 120. He could maintain attention, make simple decisions, and adequately adhere to a schedule. Tr. 110, 120. Riney could work in a non-public setting with occasional and superficial interactions with co-workers and supervisors and adapt to a setting with routine and predictable duties, without frequent or unexpected changes in job responsibilities. Tr. 110, 121.

*Hearing testimony*

Riney, who was represented by counsel, testified at the telephonic administrative hearing held in May 2022. Riney stated that he lived in a house

---

[6]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

with his wife and adult son. Tr. 48–49. Riney's wife has multiple sclerosis and Riney helps her remember and keep track of things. Tr. 49. Riney hasn't driven a car for over a year and depends on other people to take him places. Tr. 49–50. He can accompany his wife to the grocery store "when [his] agoraphobia isn't too bad, but usually it keeps [him] [home]." Tr. 50.

When asked why he stopped working, Riney cited his back pain and mental health issues. Tr. 52. He couldn't get his work done because of his back pain, so he "would get the bulk of [his] work done" and then "just go down into the closet in the basement and just have breakdowns because of the level of pain and anxiety [he] was feeling." Tr. 52.

As for his bipolar disorder, Riney said that his therapist told him that he's "rapid cycling" between depressive and manic states, but that he's "probably more manic than [he's] depressed." Tr. 55–56. When Riney is manic, he is very fidgety and anxious. Tr. 61. He has racing thoughts and "hyper energy." Tr. 61. His mind "is constantly on me about something, … like somebody just flicking you in the face." Tr. 61. During a depressive episode, Riney is in bed in a fetal position. Tr. 61. He has depressive episodes about twice a month, and they last a few hours or a few days. Tr. 61–62. Riney also said that he gets emotional easily and finds others' angry energy upsetting. Tr. 62.

Riney said that he has agoraphobia and daily panic attacks. Tr. 56. Sometimes his panic attacks last for a few minutes and sometimes they last

for several hours. Tr. 56. Riney described his panic attack symptoms as racing thoughts, finger-tapping, arm tremors, heart palpitations, and becoming "sick to [his] stomach." Tr. 56. As for his PTSD, Riney said that he has nightmares, although he doesn't experience them much lately, due, he believes, to using medical marijuana. Tr. 57. He also has problems concentrating—it's hard for him to learn something during stressful situations, like when his wife is telling him about bills. Tr. 63.

Riney stated that he takes Klonopin for anxiety and panic, which helps. Tr. 57. But it also sedates him, so it's hard for him to stay awake when he takes it. Tr. 57. He has counseling once a week by video. Tr. 58. He has missed counseling "a couple times" because "something has been going on [at home], or just having a bad panic attack and chickening out at the last minute." Tr. 58.

The ALJ discussed with the vocational expert Riney's past work as floor technician. Tr. 65–66. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Riney could perform Riney's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 67–68. The vocational expert answered that such an individual could perform the following jobs: housekeeping cleaner, mail clerk, and office helper. Tr. 68. When asked about acceptable off-task behavior and absenteeism, the vocational expert stated that an individual could not be off-

19

task more than 15 percent of a workday or absent more than two days a month on a regular basis. Tr. 69.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since January 21, 2021, the application date (20 CFR 416.971 *et seq*.).
>
> 2. The claimant had the following severe impairments: lumbar degenerative disc disease/radiculopathy/spondylosis [hereinafter, collectively, the "lumbar impairment"], diabetes mellitus, polyneuropathy, degenerative joint disease of the bilateral hips, bipolar disorder, generalized anxiety disorder, agoraphobia with panic disorder, post-traumatic stress disorder, paranoid personality disorder, and unspecified disorder of psychological development (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant may frequently balance, occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant must avoid concentrated exposure to vibration, extreme cold, and all exposure to unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine, repetitive tasks, conducted in a work setting free of production rate pace [as is found in assembly line work], which setting is non-public, and requires no more than occasional and superficial [defined as

20

precluding group, tandem, or collaborative tasks, as well as tasks involving the management of, direction of, or persuasion of, others] interaction with co-workers and supervisors, which setting is routine, and relatively predictable, in that it contemplates occasional changes.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born [in] … 1971 and was 49 years old, which is defined as a younger individual age 18–49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.  The claimant has a limited education (20 CFR 416.964).

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since January 21, 2021 the date the application was filed (20 CFR 416.920(g)).

Tr. 17–30.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Riney's sole argument is that the ALJ didn't follow the Social Security Administration's regulations when he evaluated DeLeone's opinion about Riney's off-task behavior and absenteeism. Doc. 7, at 17.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical

opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at \*14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

DeLeone submitted four opinions on Riney's behalf.[8] Tr 28. Riney challenges the ALJ's evaluation of DeLeone's May 2022 opinion about Riney's off-task behavior and absenteeism. Doc. 7, at 17–21. DeLeone indicated that Riney's impairments would cause Riney to be off-task at least 20 percent of the time during a workday and absent from work more than four times a month. Tr. 669. Riney argues that the ALJ failed to discuss the supportability factor when he evaluated this opinion[9] and misconstrued evidence in the record. *Id.*

---

[8]    The ALJ stated that DeLeone provided four opinions, dated March 4 and October 4, 2021 and April 28 and May 10, 2022. Tr. 28. Riney does not challenge the ALJ's tally or the ALJ's finding that DeLeone provided multiple opinions.

[9]    In his brief, Riney asserts that "[t]he ALJ did not discuss the required supportability factor in relation to Therapist DeLeone's Off-Task/Absenteeism Questionnaire." Doc. 7, at 20; Doc. 10, at 1. But then Riney states that "[t]he ALJ considered the required supportability factor as follows …." Doc. 7, at 21 (citing the ALJ's explanation for why he found DeLeone's off-task-and-absenteeism opinion not supported by DeLeone's own treatment notes). So it's not clear what factor, if any, Riney believes the ALJ didn't consider. For that reason alone, the Court could reject Riney's argument.

25

In support of his argument, Riney relies on various subsections found in 20 C.F.R. § 416.920c. Doc. 7, at 17–21. But he skips over the pertinent subsection, found in 20 C.F.R. § 416.920c(b)(1). This subsection states:

> Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions … in your case record. Instead, when a medical source provides multiple medical opinion(s)…, we will articulate how we considered the medical opinions … from that medical source *together in a single analysis* using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. *We are not required to articulate how we considered each medical opinion … from one medical source individually.*

20 C.F.R. § 416.920c(b)(1) (emphasis added).

Because DeLeone submitted "multiple medical opinions," the ALJ was not required to articulate how he considered each one of DeLeone's opinions, including the off-task-and-absenteeism questionnaire.[10] *See id.*; *see Tucker v. Kijakazi*, No. 21-cv-10317, 2022 WL 18032978, at *14–16 (D. Mass. Sept. 30, 2022) ("section 1520c(b)(1)[11] does not require the ALJ to discuss each of Dr.

---

[10]    Not only is this conclusion clear from the plain language of the regulation, it is also consistent with the purpose of the regulation, which was designed to streamline the ALJ's articulation standard for opinion evidence. *See* 20 C.F.R. § 404.1520c(b)(1).

[11]    The regulations governing the evaluation of disability insurance benefits and supplemental security income are found at 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920, respectively, and are identical for purposes of this case.

Tierney's opinions … individually" because Dr. Tierney provided "multiple opinions"); *Sonjia R. Lindsey v. Comm'r of Soc. Sec.*, No. 3:20-cv-1127, 2021 WL 4472211, at *2 (N.D. Ohio Sept. 30, 2021) (rejecting the argument that section 404.1520c(b)(1) applied in that case because "Plaintiff's treating psychiatrist … submitted only a single medical source statement" rather than "multiple opinions" that would trigger application of section 404.1520c(b)(1)).

The regulations require the ALJ to articulate how he considered all of DeLeone's opinions "together in a single analysis" using the relevant factors. *See* 20 C.F.R. § 416.920c(b)(1). This is what the ALJ did. The ALJ explained:

> The claimant's counselor, Barbra DeLeone, LPCC offered a total of four opinions. On March 4, 2021, she provided a non-specific narrative, indicating that social difficulties and a lack of a generalized equivalency degree were the primary barriers to "suitable" employment. On October 4, 2021, in two separate letters, she indicated that the claimant was unable to work [and that he deemed himself unable to work]. On April 28, 2022, she indicated that the claimant was unable to work, primarily due to social limitations. On May 10, 2022, she indicated that the claimant met listing 12.04 [via paragraphs "A" and "B" and "A" and "C"], with moderate limitations in his ability to understand, remember and apply information, marked limitations in his ability to interact with others, marked limitation in his ability to concentrate, persist and maintain pace and moderate limitations in his ability to adapt and manage himself, that he would be off-task 20% of the time and absent more than four days per month. Ms. DeLeone has treated the claimant since January 2021 and is reporting within the bounds of her professional certifications. However, her treatment record describes that the claimant presents as and when appointed [I believe with a single cancellation], such that there appears no objective

> basis for her opinions on absenteeism or on-task
> behavior. As regards her opinion on the four,
> psychologically-based, work-related areas of
> function, although I agree that the claimant has
> some degree of limitation in each, by comparison
> with the overall evidence of record, described in
> digest form in the analysis of the opinions of Drs.
> Zeune and Waggoner, above, Ms. DeLeone
> overstates the claimant's cognitive and social
> limitations, in some cases, to considerable degree.
> Her functional, off-task and absenteeism opinions
> are not persuasive. Her other letters are of the
> conclusory type that are now, by regulatory
> definition, neither valuable, nor persuasive.

Tr. 28. And earlier in his decision, the ALJ said this about DeLeone's letters:

> [Riney] has been in a regimen of counseling since
> January 2021(2F), (21F). His counselor, whose
> letters to the Agency (2F), (20F), are suggestive of
> significant deterioration in function, does not
> discernibly record progress [or lack of progress] in
> her treatment notes. The claimant, in other venues,
> has described the regimen as helpful (7F/3).

Tr. 23.

The ALJ discussed the supportability factor when he said that DeLeone's own treatment notes didn't support DeLeone's off-task and absenteeism finding, Tr. 28, or DeLeone's letters to the Agency, Tr. 23.[12] *See* 20 C.F.R. § 416.920c(c)(1). The ALJ discussed the consistency factor when he said that DeLeone overstated Riney's functional limitations, as compared to the state agency reviewers' functional assessments, Tr. 28, which, in turn, the

---

[12]   The ALJ "need not specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (collecting cases).

28

ALJ found persuasive after thoroughly reviewing those doctors' opinions, Tr. 27.[13] The ALJ's comment that DeLeone's letters to the Agency, in which DeLeone suggested that Riney's functioning had "significant[ly] deteriorate[ed]," were inconsistent with Riney's statements to others that counseling was helpful, Tr. 23, also goes to the consistency factor. *See* 20 C.F.R. § 416.920c(c)(2). And even though the ALJ wasn't required to discuss any of the other factors, *see* 20 C.F.R. § 416.920c(b)(2), the ALJ nevertheless did so when he cited DeLeone's specialization and treatment relationship with Riney, Tr. 28, *see* 20 C.F.R. § 416.920c(c)(3),(4). All told, Riney has not shown that the ALJ's evaluation of DeLeone's multiple medical opinions failed to comply with 20 C.F.R. § 416.920c(b)(1), which is the applicable regulation.

Even if the Court were to put aside that the regulation states that the ALJ is not required to consider each of DeLeone's opinions separately because DeLeone submitted multiple opinions, Riney still has not shown that the ALJ erred. Riney doesn't challenge the ALJ's finding that DeLeone's "May 10, 2022" opinion—assessing functional limitations, off-task behavior, and absenteeism—was one opinion. Tr. 28 (ALJ describing DeLeone's "May 10, 2022" opinion as one-out-of-four opinions). The ALJ considered the supportability and consistency factors when he evaluated DeLeone's May 2022 opinion—the ALJ found that DeLeone's off-task and absenteeism assessment

---

[13]    The ALJ was not required to recite a second time all of the findings he made when evaluating the state agency reviewers' opinions. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016).

was unsupported and DeLeone's assessed functional limitations were inconsistent with other evidence in the record. Tr. 28. Riney hasn't cited legal authority stating that an ALJ must evaluate *each finding within* an opinion under the regulations, and such a reading is contrary to the expressed purpose of the regulations. *See* 20 C.F.R. § 404.1520c(b)(1) ("Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions … in your case record"); *see also Tucker*, 2022 WL 18032978, at *16 ("A limitation finding within an opinion is not the same as the overall medical opinion itself. The relevant regulations speak in terms of medical opinions, not limitation findings therein").

Next, Riney asserts that the ALJ made a factual error. Doc. 7, at 21. He alleges that the ALJ's comment—Riney "presents as and when appointed [I believe with a single cancellation], such that there appears no objective basis for [DeLeone's] opinions on absenteeism or on-task behavior," Tr. 28—is incorrect because Riney canceled three appointments with DeLeone. Doc. 7, at 21 (citing Tr. 469 (May 6, 2021), Tr. 483 (July 8, 2021), and Tr. 701 (March 11, 2022)). But as the Commissioner points out, two of these treatment notes show that Riney canceled for reasons unrelated to his mental health. Doc. 9, at 17; *see* Tr. 483 (Riney canceling because he accompanied his wife to her medical

appointment); Tr. 701 (Riney canceling due to "illness").[14] So the ALJ's "belie[f]" that Riney canceled once is an accurate characterization of the record. Even if Riney's cancelation for "illness" could be construed as a mental health reason, that only equals two occasions, and the ALJ's "belie[f]" that Riney canceled once would not be unreasonable. In any event, the ALJ's finding that Riney "presents as and when appointed" is an accurate assessment of Riney's timely appearances at weekly appointments with DeLeone, which occurred for more than one year. *See, e.g.*, Tr. 389, 392, 506, 626 (DeLeone's letters describing "weekly" counseling sessions); *see also* Doc. 7, at 6–13 (Riney's brief detailing near-weekly counseling sessions from January 2021 to May 2022).[15]

In his reply brief, Riney argues for the first time that the ALJ's reliance on Riney's attendance record for counseling appointments was erroneous because DeLeone didn't cite this evidence in support of her opinion. Doc. 10, at 2. Riney's argument is improper because Riney raised it for the first time in his reply brief. *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). Even if the Court were to consider Riney's improper argument, it fails because Riney hasn't cited legal authority stating that an ALJ may only discuss items that the provider cites in a medical opinion when evaluating the opinion. Here,

---

[14]    Riney canceled the third appointment because he slept badly the two nights before the appointment. Tr. 469.

[15]    Some of Riney's visits were by "telehealth." *See* Tr. 491, 493. Riney has not argued that his ability to attend telehealth appointments is material to the ALJ's decision, so he has forfeited any such argument.

the ALJ relied on the absence of objective evidence in DeLeone's records to find unsupported DeLeone's opinions on off-task behavior and absenteeism. Tr. 28. The ALJ's reasoning was proper. *See* 20 C.F.R. § 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) …, the more persuasive the medical opinions … will be"); *see Sallaz v. Comm'r of Soc. Sec.*, No. 4:22-cv-1239, 2023 WL 5043702, at *11 (N.D. Ohio June 26, 2023) (the ALJ properly relied on the lack of objective evidence in a medical opinion to find that the opinion was unsupported), *report and recommendation adopted*, 2023 WL 5266613 (N.D. Ohio Aug. 16, 2023), *appeal docketed*, No. 23-3825 (6th Cir. Oct. 12, 2023).

Riney submits that his ability to attend weekly sessions with DeLeone doesn't mean that he would be able to perform full-time work. Doc. 7, at 21–22. But the ALJ cited Riney's ability to attend weekly sessions as a reason why DeLeone's opinion was unsupported, not that Riney's ability to attend weekly sessions meant that Riney was not disabled.

Finally, Riney recites objective evidence in the record that he believes supports DeLeone's opinions.[16] Doc. 7, at 22–25 (citing, among other findings,

---

[16]    Some of the evidence that Riney cites, such as Riney "having breakdowns and panic attacks," Doc. 7, at 23, is not objective. *See* Tr. 678 (Riney reporting breakdowns and panic attacks). Riney's results from self-scoring tests for depression and anxiety, Doc. 7, at 23, Tr. 718–21, also are not objective. *See, e.g., Swain v. Berryhill*, No. 3:17-cv-1405, 2018 WL 4006814, at *17 (N.D. Ohio May 2, 2018) ("the Beck Depression Inventory is 'a 21-item, self report rating inventory," and thus, is based upon Swain's subjective report")

Riney's anxious and depressed mood and impaired judgment). But this Court may not re-weigh the evidence, *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984), and is limited to determining whether substantial evidence supports the ALJ's conclusion, *Jones*, 336 F.3d at 477. Here, substantial evidence supports the ALJ's conclusion.

The ALJ recognized that Riney at times presented with a depressed and anxious mood and impaired judgment, Tr. 23–24, 27, and that the record showed that Riney suffered from "chronic psychological disorders, Tr. 27. The ALJ, when finding persuasive the state agency reviewers' opinions, found that these disorders:

> would be expected to interfere with focus and concentration, and the claimant is assessed with intellectual function in the borderline range (7F/4). However, he retains an adequate fund of knowledge (17F/3) and is reliably reported with normal memory function (11F/3), (19F/5), cognition, attention and concentration (11F/3), (17F/3), (19F/15), as well as a normal, goal-directed thought process (10F/5, 27, 41). The claimant's intellectual function and symptoms of depression and anxiety rule out any complexity of work, but if restricted to simple, routine, repetitive tasks, conducted free of anxiety- or frustration-inducing production pressures, the claimant appears to have retained sufficient, residual, cognitive function to serve as "backstop" against these deficits from becoming fatal to competitive work. The claimant has reported social anxiety (7E/2) and does present in the record with overt signs of anxiety (7F), (10F/41). However, his forensic history is *de minimis* (7F/2), he describes

---

(quoting *Brown v. Comm'r of Soc. Sec.*, No. 1:14-cv-720, 2015 WL 4430395, at *3, n.8 (N.D. Ohio July 20, 2015)), *report and recommendation adopted*, 2018 WL 4002604 (N.D. Ohio Aug. 22, 2018).

regular interaction with family and a couple of friends (2A/2), (7F/3), is demonstrably able to function in public settings, such as stores (2A/2), (10F/43) or local parks (21F/10) and is reliably reported in the record in pro-social terms (10F/32, 51), (7F/3), (19F/15). Provided he is not asked to interact with the public and that his interaction with others is controlled, both as to its frequency, and as to its potential for escalation in intensity, the claimant appears to have retained sufficient, residual, social function to engage in competitive work. The claimant has described withdrawal in response to stressors (2A/2), and some treatment notes suggest impairment of insight or judgment (10F/17). However, the claimant's insight and judgement are typically reported as within normal limits (10F/5), (19F/15), (10F/32, 41, 51) or good (17F/3). His mental status examinations did not materially deteriorate (10F/5) *compare with* (10F/9, 11), despite the stressors of going through a domestic violence charge with his son (10F/5). He is able to provide care for his wife, who has multiple sclerosis (7F/2). If restricted to the performance of tasks simple, routine and repetitive to begin with, conducted free of anxiety- or frustration-inducing production pressures, where he would not be asked to respond to constant change or an unpredictable workplace, he appears to have retained sufficient, residual, adaptive function to engage in competitive work.

Tr. 27. The ALJ also commented that Riney was "resistant to the use of most psychotropic medications," inconsistently reported how often he took benzodiazepines, and "was enrolled in medication management only during November 2021." Tr. 23 (citing Tr. 257, 291, 516, 621–23; *see also* 619). The ALJ detailed Riney's many daily activities and found that Riney's ability to perform these activities undercut Riney's complaints of disabling symptoms

34

and limitations and "strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the [RFC]." Tr. 25.

As for Riney's statements about the limiting effects of his symptoms, the ALJ concluded:

> they are inconsistent because the claimant has been noted to exhibit manipulative behaviors (10F/19). He requested advice from his primary care physician requesting which diagnosis to report in connection with his disability claim (1F/8), requested referrals for x-rays to advance his disability claim (5F/6), (15F/60), requested prescriptions for a cane and transcutaneous electric nerve stimulator (15F/60), despite having reported to his pain management provider that a TENS unit made his symptoms worse (22F/2). The claimant reported being too anxious to leave home for a medical appointment (4F/8) but would drive to Cleveland to borrow money from a friend to purchase medical marijuana (10F/32). He would report to the Agency that he could not read, or write, even a simple message (3E/3), but reported reading a biography of a professional wrestler while in session with the consultative examiner (7F/2-3). He described his primary care physician as impeding his disability claim because his doctor wanted him to be functionally tested (21F/45). He reported to his counselor that he stopped working because he had to hide in a closet and cry for most of his shift (21F/43). He reported to the Agency that he stopped working due to an admixture of his condition and Covid quarantine restrictions (3E/3). He reported to the consultative examiner that he stopped working to care for his wife, who has multiple sclerosis (7F/2).

Tr. 25.[17] Riney hasn't challenged any of these findings.

---

[17]    The ALJ's finding that Riney made inconsistent statements to others, including DeLeone, about why he stopped working also goes to the supportability and consistency factors of DeLeone's opinion, since DeLeone in

Riney has not shown that the ALJ failed to follow the correct legal standard or made factual findings unsupported by the record, so the ALJ's decision should be affirmed. *See Jordan*, 548 F.3d at 422.

**Conclusion**

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: February 15, 2024

 /s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).

---

part relied on Riney's subjective reports of hiding and crying at work to support her off-task and absenteeism findings. Tr. 669.